## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LINZY LEE HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO.  CIV-10-1232-HE |
| | ) | |
| BOARD OF REGENTS FOR | ) | |
| OKLAHOMA CITY COMMUNITY | ) | |
| COLLEGE, a statutory state | ) | |
| agency of the State of Oklahoma, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Linzy Lee Hill sued the Board of Regents of Oklahoma City Community College ("OCCC") alleging that, while working at OCCC, he was subjected to a racially hostile work environment and constructively discharged, and was retaliated against for engaging in protected conduct in violation of Title VII of the Civil Rights Act of 1964.  He also asserts a retaliatory/constructive discharge claim under state law.  Defendant has filed a motion for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The court has viewed the evidence and any reasonable inferences that might be drawn from it in the light most favorable to plaintiff, the nonmoving party, and concludes defendant's motion should be granted.

Background

The parties' submissions indicate the following factual background is substantially

undisputed.  Plaintiff was a long time employee of OCCC.[1]  In 2000 he was assigned to the college's test center, where he worked under James Ellis.  On February 11, 2009, Ellis informed Millie Tibbits, OCCC's Director of EO/AA, that Hill had made a complaint that a coworker, Ron Brooks, had called him a "nigger" on February 6, 2009.  Hill also contacted Tibbits directly about the incident.

Tibbits investigated the complaint by interviewing Hill, Brooks and another employee, Ms. Hulseberg, who was present during the verbal exchange.  The facts, as reported by Tibbits in an April 8, 2009, memorandum to Ellis (the Investigation Report), were that Ellis, Brooks and Hulseberg were discussing an article in a local paper concerning a remark a state representative had made about gays on the morning of February 6, 2009.  Brooks claimed Hill used the word fag several times and that he tried to point out that the term, like the word "nigger," had a negative connotation.  While he admitted saying the word nigger, Brooks denied using it in reference to Hill.  Hill denied that he had referred to homosexuals as fags.[2] Ms. Hulseberg told Tibbits she could not recall the conversation and also said she did not want to get involved.[3]  Due to lack of corroboration, Tibbits was unable to determine which

---

[1]*He had been employed by OCCC since 1980.*

[2]*Plaintiff states in his brief that "Tibbits even told Hill that Hill called Brooks a 'faggot' and **'he called you a Nigger,** so we'll leave it at that."  Plaintiff's response, p. 3.  However, plaintiff's cited  deposition testimony reflects that Tibbits did not accuse Hill of calling Brooks a faggot, but was merely reporting what Brooks had said.  Plaintiff's Exhibit 1, p. 73("Tibbits came up with that and said, 'He said you said – called him fagot, and he call you nigger, so we'll leave it at that.'").*

[3]*While plaintiff acknowledges that Hulseberg told Tibbits she did not recall what was said and did not want to get involved, he asserts that Tibbits did not talk to Hulseberg until seventeen days after the incident occurred.*

of the different accounts of the incident – Hill's or Brooks' – was accurate.  It became, she wrote in the Investigation Report, "an issue of Mr. Hill's word against Mr. Brooks' word." *Id.*

The evidence indicates that Tibbits met with Ellis on April 9, 2009, to discuss the results of her investigation.  She described it as a "he said, he said" situation and recommended that both Hill and Brooks be required to complete an online harassment training course, be counseled separately and be told that the use of derogatory terms such as "nigger," "fag," or "faggot," was prohibited in the work environment and that allegations of use of such terms would be investigated and, if corroborated, might result in disciplinary action.

Defendant's submissions indicate that Ellis accepted Tibbits' suggested action, which was detailed in a second memorandum to Ellis (the Recommended Determination), and that he counseled Hill about the incident on April 27, 2009, and Brooks the following day.  The counseling was not disciplinary action and neither Hill nor Brooks suffered any adverse consequences.  Ellis provided both Hill and Books with a memorandum about the incident in which he summarized the findings of the investigation – "The issue devolved into a that-person -said-this-person -said situation," and warned that use of the terms involved in the verbal exchange would not be tolerated and that future use, if corroborated, would result in disciplinary action.  Also included was the requirement that Hill and Brooks attend an online session on the respectful workplace.

Tibbits noted in her Recommended Determination that, while Hill had denied using

the word "fag," "in a separate informal investigation in December 2008, another co-worker of Mr. Hill's reported that she heard Mr. Hill used the word 'fag' or 'faggot.'" Tibbits stated in the memo that the co-worker had not been interviewed as part of the Hill-Brooks investigation, but her allegation against Hill for using the derogatory term had been documented at that time. *Id.* Tibbits did not discuss the earlier allegation with Hill during her investigation of the February 2009 incident.[4]

It is undisputed that Hill did not complain of any other incidents of racial discrimination or harassment after February 6, 2009. He did, though, complain to Tibbits about the results of her investigation after she released her report. His conversation with her is documented by a file memorandum dated May 14, 2009. Plaintiff's Exhibit 14. In it Tibbits reported that plaintiff was upset by her April 9, 2009, Findings of Fact memorandum, which plaintiff apparently did not receive until May 2009, even though it was addressed to him.[5]

In the April 9, 2009, memorandum to Hill regarding his discrimination complaint, Tibbits made findings including the following:

---

[4]*Plaintiff asserts that "it appears that Tibbits placed some emphasis on [the] earlier, unsubstantiated claim that Hill had used the word 'faggot' earlier in his career with OCCC." Plaintiff's response, p. 5, ¶8. The record does not reflect that the comment had any impact on Tibbits' findings or recommendation. The court notes that, while plaintiff characterizes the alleged remark as having been made "earlier in his career," it was reported in December 2008, just a couple of months before plaintiff's altercation with Brooks.*

[5]*Tibbits wrote on the back of the copy given to plaintiff: "Linzy– There was some confusion as to whether I sent this memorandum to you or if Jim was giving it to you when he met with you last month. I apologize for the confusion. I am providing it to you at this time." Plaintiff's Exhibit 16.*

Hill and Brooks were involved in a verbal confrontation on February 5, 2009.[6] Brooks said he looked up the definition of the words "nigger" and "fag," admitted he said the word "nigger," but did not admit that he referred to Hill as a "nigger." Brooks stated he was "trying to point out that the word 'fag' is derogatory in the same sense that 'nigger' is offensive." Hill denied using the word "fag" to refer to homosexuals while he was in the Test Center, claiming there was no reason to use that word.

Plaintiff's Exhibit 16. Because Ms. Hulseberg could not recall the conversation that occurred or would not confirm either party's version of it, Tibbits concluded in the memo that it became "an issue of Linzy Hill's word against Ron Brooks' word" and that "[t]he use of the word 'nigger' and/or 'fag' or 'faggot' is not acceptable in the OCCC educational or working environment." *Id.*

During plaintiff's May conversation with Tibbits, he said that he had done nothing wrong. He told Tibbits that, while he never used the term "faggot," Brooks had admitted using the word "nigger." Tibbits explained that Brooks denied that he had used the term in reference to plaintiff. When Hill "said it makes it appear that the word 'faggot' is on the same level as the word 'nigger,'" plaintiff's Exhibit 14, Tibbits responded "that the document was not saying that," but "was pointing out that neither word was appropriate in [OCCC's] workplace." *Id.* The May 14th memo reflects that Tibbits then tried to go over the Findings of Fact document with plaintiff, explaining that because "[t]here was no one willing to corroborate the conversation," *id.*, the conclusion "was that it was one person's word against the other." *Id.* Hill then said that Ms. Hulseberg could tell her what happened and was upset when Tibbits said she had talked to her but she did not recall the discussion.

---

[6]*The date obviously was a typographical error.*

The memo then states that Hill "talked for quite a while about past remarks and racial issues that occurred while he has been an employee at OCCC for the last 25 years,"[7] and said that "the College never settled the old issues – they just moved him." *Id*. Hill told Tibbits that "he was so upset about this he couldn't sleep." *Id.*

Tibbits had Hill review and sign her notes on their conversation regarding the incident, but did not do the same thing with Brooks. She could not explain why she did not have Brooks sign the summary of her meeting with him.

Plaintiff was off work May 5 through May 8, 2009, and May18 through May 29, 2009. Neither of OCCC's copies of  plaintiff's applications for his May leave specify why the leave was requested. Plaintiff's copy of his leave application for May 5 through 8 gives as the reason for the leave request: "stressed out behind Racial Harassment I could not take this attitude and negative offenses shown by test center employees." Plaintiff's Exhibit 5. His copy of the leave application for May 18 through 29 specifies as the reason he requested leave: "Racial Discrimination, Harassment." *Id.* He gave "stressed headache, cause severe, cannot keep food in my stomach upset stomach" as the reason for a June 15 leave request. *Id.*

Brooks subsequently complained to Ellis in early June 2009 that Hill was insulting and possibly threatening him. Audio and visual recordings from the test center's recording system showed Hill telling Brooks he was "'a very little idiot,' that he smelled bad, was

---

[7] *Plaintiff only gave one specific example of a past racist remark.  He said that an employee had written "on a piece of paper the word 'nigger' earlier in Linzy's career at the college." Plaintiff's Exhibit 14.*

'dumb, stupid,' a 'dumb stupid fool' and a 'little racist bastard.'"[8]  Defendant's motion, p. 5, ¶11.   On August 4, 2009, Ellis met with Hill, the Dean of Student Development, Liz Largent, and Rhonda Simpson, the Director of Employment and Acting Director of Benefits. Ellis gave Hill a written reprimand based on the comments to Brooks.  Plaintiff did not suffer any loss of pay, reduction in wages or change in duties and was not demoted or terminated as a result of the reprimand.   Ellis never spoke to Hill after August 4, 2009, though he indicated he  attempted to contact him several times, and did not make any employment decisions with respect to him.  He expected Hill would be returning to work.  At some point Hill filed an internal complaint of discrimination against Ellis pertaining to Hill's April 27, 2009, counseling and August 4, 2009, reprimand.

Hill claims he also was discriminated against on the basis of his race earlier in his career at OCCC, principally when he was supervised by an individual named Jeff Beed. Beed was the test center coordinator from October 2001 until January 27, 2003.[9]   He then worked for OCCC as an adjunct instructor until May 2004.  He asserts that Beed wrote him up on several occasions and gave him poor evaluations. He also states that, at some unspecified time, he was warned by a board member at an NAACP meeting to be careful because OCCC had hired someone whose "father was a high member with the KKK" and that individual was Beed.  Plaintiff's response, p. 7.  He describes a physical confrontation

---

[8]*While plaintiff challenged defendant's fact statement nos. 10-16  as being immaterial, he did not specifically controvert them.  Accordingly, they are deemed admitted. LCvR56.1(c).*

[9]*Plaintiff states that "all interactions with Jeff Beed started in 2001, but the majority of interactions included in this matter occurred when Defendant hired Jeff Beed to be over Test Center and over Hill."  Plaintiff's response, p.6, ¶19.*

with Beed[10] and states he "reported this and wanted Beed terminated, but that did not

happen."  *Id.*  Although Ellis had heard the rumor that Beed or members of his family were

associated with the KKK, he did not attempt to verify it with Beed, even though Beed was

Hill's supervisor.

Plaintiff also discusses two other instances of discrimination that occurred "[e]arlier

in his career."[11]  *Id.*  One occurred when plaintiff was working in the physical plant and a

coworker, Steve Duncan, "used the 'N' word in reference to Hill."  Plaintiff's response, p. 7.

Plaintiff retrieved a piece of paper from the floor on which Duncan had written "'I can't

stand to work with the (Nigger scratched out), incompetent asshole any more.'"  *Id.* at p. 8.

Plaintiff filed a complaint about the incident.  He states in his response brief that "nothing

was done to Duncan.  Instead, Hill was moved to another position."  *Id.*  However, in the

deposition testimony cited, plaintiff testified that ""We got – I got to – to sit and talk with

Steve Duncan and – and I agreed with Gary Lombard, they would just put it in his file, and

we agreed to move me somewhere else because of all the – what was going on.  And I guess

I was too happy to move, also, because –."  Plaintiff's Exhibit 1, p. 31.

The other incident occurred when plaintiff worked in the student union and involved

his supervisor, Diana Boyd.  A student had written a complaint about plaintiff on a public

---

[10]*Plaintiff describes the incident in an interrogatory response.  He states that after some discussion during a meeting regarding an alleged complaint that had been made regarding plaintiff, he "got up and headed toward the door, but Beed got up and threw a karate move which hit Plaintiff's left shoulder.  Beed then made a second move knocking Plaintiff into his seat."  Plaintiff's Exhibit 6.*

[11]*Plaintiff fails to specify the dates of these incidents.  However, since he had been in the test center since 2000, they occurred sometime before then.*

bulletin board in the student union and used the term "boy."  After Hill complained to Boyd about the remark[12] she wrote on the board: "'We will discipline this boy and we have talked to this boy.'"  Plaintiff's response, p. 8.  Plaintiff then spoke with another supervisor, Gary Lombard, who said he talked to Boyd about the incident.  Plaintiff states in his response that he "was unaware whether anything was done to Boyd."  *Id.*   However, in his deposition plaintiff testified that soon afterwards Boyd left the college,[13] that she apologized and he "accepted it."  Plaintiff's Exhibit 1, pp. 101-02.

Finally, plaintiff makes the general assertion that he had "continued problems with his supervisors and their furtherance of a racially hostile environment during his employment with OCCC.  In addition to Beed ... John Hockett continually harassed Hill, until Hill became tired of the situation and complained to Ellis and another supervisor, Marion Paden about Hockett and Beed."[14]  Plaintiff's response, pp. 8-9.[15]

Following the August 4, 2009, meeting during which he was reprimanded for the June incident, plaintiff asserts he had a nervous breakdown and went straight to Norman Regional Hospital.  Plaintiff submitted a request for leave under the Family Medical Leave Act

---

[12]*See* <u>Tademy v. Union Pacific Corp.</u>, *614 F.3d 1132, 1142 (10th Cir. 2008) (The word "boy" has "been used to demean African–American men, among others, throughout American history.").*

[13]*Boyd resigned from OCCC, effective July 1, 1999.*

[14]*Hockett resigned from OCCC, effective September 23, 2006.*

[15]*In the cited authority, pages 136:2-137:11 of Hill's deposition, Hill testifies that "the college wasn't doing nothing about this attitude that John Hockett had," and that plaintiff apparently told Hockett that he was not going to meet with him, but would go "straight to Marion Paden's office," and that one evening Beed came into the test center and plaintiff "went straight to Ms. Paden's office, because [he] was upset and scared." Id.*

9

("FMLA") and was notified by Rhonda Simpson on August 14, 2009, that his request was approved effective August 10, 2009.  The Certification of Health Care Provider form submitted by plaintiff's doctor states plaintiff had a chronic condition involving bleeding and that stress would increase the severity of his symptoms.  The physician did not provide an estimated end date for plaintiff's period of incapacity.  Plaintiff testified that stress, coupled with his medical issues,[16] was the reason he left OCCC and stayed off work.

Simpson notified Hill by letter dated November 20, 2009, that he had exhausted his FMLA leave.  She informed him that if he was still unable to return to work he could request additional leave or other accommodation under the Americans with Disabilities Act.  That would require, the letter stated, for Hill to submit a health care provider statement explaining the reason for, and duration of, his continued absence from work.  Plaintiff was also told that he would exhaust his active sick and personal leave by November 25, 2009, but could request that banked leave be unbanked.

Hill did not return to work, but instead submitted an unbank leave request form.  The leave "End date" on the form was left blank.  Simpson approved the request.

Simpson spoke with Hill on February 5, 2010, regarding his options, including filing for long-term disability (LTD) or retirement disability benefits.   A week later Hill brought a claim form for Aetna LTD benefits to OCCC's human resources' office.  Simpson completed the employer's section of the form on February 12, 2010.  She gave the benefits application to Maria Lopez, a Human Resources Assistance, and directed her to mail it to

---

[16]*Plaintiff also had to have surgery to remove one of his kidneys.*

Aetna.  Defendant's submissions indicated the insurer has 45 days to process an LTD claim

and that Simpson did not expect to hear from Aetna until it was preparing to decide the

claim.

From March 13 through March 21, 2010, OCCC's offices were closed for spring

break.  Simpson checked the status of Hill's claim on March 15, 2010, and learned Aetna had

not received his claim form.  She emailed Lopez and directed her to fax a copy of it to Aetna.

It was faxed the first day the college reopened, which was March 22, 2012.

Plaintiff asserts that defendant did not just delay the submission of his paperwork, but

lost the LTD benefit form he had initially submitted and replaced it with a form that specified

a different (earlier) estimated return to work date.  Plaintiff's response, pp. 10-11.  Plaintiff

testified that Simpson contacted his primary care physician and had him complete new

paperwork with a return to work date of March, 2010, which was incorrect.[17]  Plaintiff asserts

that his initial paperwork gave June 25, 2010, not March 25, 2010, as his estimated return to

work date.[18]  He learned of the mistake when he contacted Aetna and was told that his LTD

claim was approved through March, 2010.  Plaintiff testified that he took the form to his

physician to have it corrected, and then took the revised form to Simpson, but "was not paid

for three (3) months of disability leave when that was indicated on the original paperwork."

Plaintiff's response, p. 11.  Though not clearly stated, plaintiff appears to claim that Simpson

---

[17] *Although Simpson denied having contacted plaintiff's physician or having received the revised paperwork, because OCCC is the moving party the factual dispute will be resolved in plaintiff's favor for persent purposes.*

[18] *It appears the initial form had, as the return to work date, "63/25/10."  Plaintiff's Exhibit 11, Bates no. 0424; plaintiff's Exhibit 3, pp.29.*

failed to send the corrected paperwork to Aetna and thus deprived him of three months of disability benefits.[19]   Simpson did not recall discussing plaintiff's estimated return to work date with Aetna or plaintiff's physician.  She also denied seeing the revised paperwork. Simpson learned on June 9, 2010, that Aetna approved plaintiff's claim for LTD benefits for the period from October 4, 2009, through March 24, 2010.[20]

Hill was paid through the first three days in February 2010, due to the paid leave he had accumulated.  He then remained an employee on unpaid leave of absence while his LTD claim was processed.  He did not return to work at OCCC, but sent a letter, which the school received around June 28, 2010, stating that he was retiring effective June 25, 2010.[21]   Since plaintiff left OCCC he has been unable, due to a cancerous kidney, to work elsewhere and is on total disability Social Security benefits.

It is substantially undisputed that sometime after April 20, 2010, Simpson learned that Hill had filed two charges of discrimination with the EEOC, the first in September 2009, and the second on April 14, 2010.  Defendant's submissions indicated she was unaware of either charge at the time she directed Ms. Lopez to mail and later fax plaintiff's LTD benefits claim to Aetna.  However, Simpson apparently did know that plaintiff had previously made an

---

[19]*The court has not considered the letter from Aetna to plaintiff dated May 25, 2010, which defendant attached to its reply brief as Exhibit W, or its new argument that plaintiff would not have been able to receive disability benefits past March 24, 2009, as plaintiff did not have the opportunity to respond to them.*

[20]*The disability plan had a 60 day waiting period and plaintiff became eligible 60 days after August 4, 2009, his last day of work.*

[21]*OCCC had not taken steps to terminate plaintiff.*

internal complaint of discrimination. Plaintiff asserts that "OCCC clearly had knowledge that Hill had filed a Charge of Discrimination in September 2009," but fails to cite any supporting evidence or identify which individuals at the college were aware of the charge.

Analysis

Racially hostile work environment/constructive discharge (Title VII)

In its brief defendant initially addresses the sufficiency of plaintiff's evidence to demonstrate a racially hostile work environment and then raises a statute of limitations defense. The court will address those arguments in reverse order.

Statute of Limitations

Defendant makes two statute of limitations arguments. First, it contends plaintiff's harassment claim is barred because it was the subject of his initial September 17, 2009, EEOC charge and he failed to sue within 90 days of receipt of his right to sue letter.[22] Second, it contends the claim is barred because plaintiff failed to show that any act of harassment occurred within the 300 days preceding the filing of his April 14, 2010, EEOC charge.[23]

Plaintiff filed an EEOC charge relating to the February 6, 2009, incident on September

---

[22]*The ninety -day filing requirement is not a jurisdictional prerequisite to filing suit in federal court, but rather "'is a condition precedent to suit that functions like a statute of limitations.'"* Conkle v. Potter*, 352 F.3d 1333, 1336 n.6 (10th Cir. 2003) (quoting* Million v. Frank*, 47 F.3d 385, 389 (10th Cir. 1995)).*

[23]*"Title VII requires a plaintiff to file a charge of discrimination within 300 days of the alleged discriminatory act. Upon receipt of a right to sue letter, he must file suit within 90 days."* Tademy*, 614 F.3d at 1150.*

17, 2009.[24]   He checked the race, retaliation and age boxes and alleged the following

particulars:

    I.    On February 6, 2009, co-worker Ron Brooks called me a nigger.  I reported this
           incident to Millie Tibbits, EO/AA Compliance Officer.  An internal investigation was
           conducted.

    II.   Investigation inconclusive, he said, she said, was the conclusion of the internal
           investigation.

   III.  I believe that I have been discriminated against due to my race, Black, in violation of
           Title VII of the Civil Rights Act of 1964, as amended.  I believe that I have been
           discriminated against due to my age, in violation of The Age Discrimination in
           Employment Act of 1967, as amended.

Defendant's Exhibit O.  The EEOC issued a right to sue letter on September 17, 2009.

Plaintiff did not file suit within ninety days but instead, on April 14, 2010, filed another

charge with the EEOC alleging race discrimination and retaliation.  Defendant's Exhibit Q.

In it, he claimed that throughout his employment at OCCC he "experienced racial comments

and attitudes, and ... was not given the titles, promotions or recognition [he] deserved because

of [his] work;" that while working in the test center he was harassed and given poor,

undeserved evaluations by Bead, his supervisor who physically hit him; that he was

wrongfully blamed for violations in testing procedures; that he was called a "nigger" by a

coworker in February 2009 and that "OCCC did not take adequate steps to deal with the

---

[24]*Defendant mentioned plaintiff's April 20, 2010, EEOC charge in its fact statement but did
not discuss either charge or the  September 17, 2009, right to sue notice until the discussion segment
of its brief or authenticate those exhibits.  However, as plaintiff attached both charges and the notice
to his Amended Complaint, the court has considered those documents to be unchallenged by
plaintiff.*

discrimination" and delayed in processing the paperwork for his disability benefits.  *Id.*[25]

Defendant contends, and some courts agree, that "a plaintiff may not reallege an earlier EEOC charge in a subsequent EEOC charge."[26]  Johnson v. Chicago Bd. of Educ., 2007 WL 317030, at *7 (N.D.Ill. 2007).[27]  Their rationale is that "[o]therwise, the time limitations of 42 U.S.C. §2000e-5(f)(1) would be meaningless, because potential Title VII plaintiffs could evade those requirements simply by seeking additional Notices of Right to Sue whenever they pleased." Soso Liang Lo v. Pan American World Airways, Inc., 787 F.2d 827, 828 (2d Cir. 1986).  However, in Tademy v. Union Pacific Corp., 614 F.3d 1132 (10th Cir. 2008), a case involving a racially hostile work environment, the Tenth Circuit concluded that the plaintiff was "not barred from raising claims included in a previous complaint for which he received a right-to-sue letter," despite his failure to litigate those claims within 90 days.  *Id.* at 1150.[28]

---

[25]*In his April 2010 charge plaintiff states, with respect to the February 2009 incident, that OCCC did not deal with the situation adequately and instead blamed plaintiff for wrongdoing and threatened him with termination or reprimand, although he did nothing wrong.  Defendant's Exhibit Q.*

[26]*Plaintiff's response ignores the issue of whether he was barred from "presenting allegations in support of a hostile environment claim that he had advanced in a prior EEOC complaint but chosen not to litigate within 90 days of a right-to-sue letter." Tademy, 614 F.3d at 1151.*

[27]*The previous charges in Johnson pertained to discrete acts of discrimination, not a hostile work environment. See Frazier v. Vilsack, 419 Fed.Appx. 686, 689-90 (8th Cir. 2011) (unpublished) (court held employee who failed to file suit within 90 days following receipt of right to sue letter was "barred from ever bringing a federal claim related to that EEOC charge," in case involving an initial EEOC charge that alleged a racially hostile work environment and a subsequent charge that alleged retaliation).*

[28]*The plaintiff in Tademy had, though, "reached an agreement with [his employer] not to exercise his right [to sue]." Tademy, 614 F.3d at 1151.  The court noted that the employer "is not defenseless if it believes it has been prejudiced by unfair delay," as it could "resort to a variety of*

Even if plaintiff's harassment claim is not precluded by his failure to file suit within 90 days of his earlier EEOC charge, defendant contends he is limited, in establishing his race-based hostile work environment claim, to incidents that occurred on or after June 16, 2009.  Defendant asserts "[p]laintiff will fail to show that any action taken by OCCC toward him within the 300 day limitations set forth in Title VII, was motivated by the race of Plaintiff."  Defendant's motion, p. 30.  Plaintiff responds that "[h]ere, there is little question that Hill's leave [sic] from OCCC (whether ruled a constructive discharge or not) was based, according to Hill, on his racially charged environment and OCCC's failure to remedy that environment, and that it occurred within 300 days of his April 2010 Charge of Discrimination."  Plaintiff's response, p. 22.

The Supreme Court held in <u>Morgan</u>  that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  <u>Morgan</u>, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)).  As long as one act contributing to the claim occurs within the filing period, component acts of the hostile work environment that fall outside the statutory time period may be considered for purposes of determining liability.  *Id.*  However plaintiff still must show that "'*an act contributing to that hostile environment* [took] place within the statutory time period.'"  <u>Tademy</u>, 614 F.3d at 1139 (quoting <u>Morgan</u>, 536 U.S. at 105).  The problem here is that plaintiff failed to identify  what act "contributing to a hostile work environment took place no more than 300 days before [he] filed [his April 14, 2010] EEOC charge."   <u>Duncan v. Manager, Dep't of</u>

---

*equitable defenses."  Id. at 1151-52.*

Safety, City and Cnty. of Denver, 397 F.3d 1300, 1308 (10th Cir. 2005).  The specific conduct discussed in the parties' briefs occurred outside the statutory period[29] also relates to acts and incidents that took place before June 16, 2009.[30]

Accordingly, plaintiff's hostile work environment/constructive discharge claim is time-barred because he has not offered any evidence "that an act contributing to the claim occurr[ed] within the filing period." Morgan, 536 U.S. 117.  However, even if the court found plaintiff could rely on the February 2009 incident and preceding conduct to demonstrate racially motivated harassment, defendant would still be entitled to summary judgment on plaintiff's  hostile work environment claim.

Hostile work environment/constructive discharge (Title VII)[31]

"To survive summary judgment on a racially hostile work environment claim, a plaintiff must show 'that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus.'" Chavez v. New Mexico, 397

---

[29]The court has limited its consideration of the record to those portions cited by the parties in their briefs.  See Chavez v. New Mexico, 397 F.3d 826, 839 (10th Cir. 2005) ("'Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.") (quoting Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir.1995).

[30]Plaintiff does not dispute that June 16, 2009, was the date the limitations period commenced.

[31]Hostile environment claims proceed in three steps. Tademy, 614 F.3d at 1139.  The court determines what conduct is part of the same hostile work environment (if some of the acts fell outside the statutory limitations period), whether a reasonable jury could conclude that the conduct was pervasive or severe enough to create a hostile work environment, and whether sufficient evidence is presented "to give rise to a reasonable inference that [the employer's] response to the incidents of which it was apprised was inadequate." Id. at 1139.

F.3d 826, 831-32 (10th Cir. 2005) (quoting <u>Bolden v. PRC Inc.</u>, 43 F.3d 545, 551 (10th Cir.1994)).  Factors considered in determining whether a working environment is sufficiently hostile or abusive include: "( 1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance."  <u>MacKenzie v. City and Cnty. of Denver</u>, 414 F.3d 1266, 1280 (10th Cir. 2005).  A showing of pervasiveness requires "more than a few isolated incidents of racial enmity."  <u>Bolden</u>, 43 F.3d at 551 (internal quotations omitted).  "Instead, 'there must be a steady barrage of opprobrious racial comments.'" <u>Chavez,</u> 397 F.3d at 832 (quoting <u>Bolden</u>, 43 F.3d at 551)).  In contrast, "a sufficiently severe episode may occur as rarely as once." <u>Tademy</u>, 614 F.3d at 1144 (internal quotation omitted).

Plaintiff's evidence is insufficient to create a fact question as to whether "'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[32]  <u>MacKenzie</u>, 414 F.3d at 1280 (quoting <u>Penry v. Fed. Home Loan of Topeka</u>, 155 F.3d 1257, 1261 (10th Cir.1998)).  Even fully crediting plaintiff's version of the incident with Brooks, a single episode of use of the word "nigger" by a coworker, while offensive, falls short of the necessary showing.  The events involving

---

[32]*While plaintiff may have subjectively perceived the environment to be abusive, the evidence is insufficient to demonstrate that "a reasonable person in [Hill's] position would have viewed the alleged [racial] harassment to be threatening or severe." <u>Morris v. City of Colorado Springs</u>, 666 F.3d 654, 669 (10th Cir. 2012). "'[A] plaintiff must show that the environment was both objectively and subjectively hostile or abusive." Id. at 664 (<u>quoting Davis v. U.S. Postal Serv.</u>, 142 F.3d 1334, 1341 (10th Cir. 1998)).*

18

Beed occurred many years prior to the February 6, 2009, and are not appropriately considered part of the same hostile work environment.[33]   Moreover plaintiff offered no evidence that Beed's conduct was "'racial or stem[med] from racial animus.'" Tademy, 614 F.3d at 1139 (quoting Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir.1998)).   And plaintiff's contention that Hockett "continually harassed [him]," plaintiff's response, p. 8, is far too general to support his claim.

The other incidents plaintiff cites, those involving Duncan and Boyd, were similar to his interaction with Brooks.[34]   However, even when considered in conjunction with the February 6, 2009, incident, the abuse on which plaintiff relies to support his claim "fall[s] far short of the 'steady barrage' required for a hostile environment claim." Chavez, 397 F.3d at 832.[35]   *See generally*  Tademy, 614 F.3d at 1143 (although plaintiff may "not have been

---

[33]*Beed's interactions with plaintiff occurred while he was working in the same place as his later encounter with Brooks – the test center.  However, the Tenth Circuit has distinguished physical confrontations that did not involve racial epithets and did not contribute to subsequent discriminatory acts, from other incidents of harassment.   Tademy, 614 F.3d at 1142.  The negative performance evaluations would probably not be considered part of the same unlawful employment practice, as they constitute discrete acts of discrimination.*

[34]*As such, they could be considered to be part of the same hostile work environment. Plaintiff failed to state when most, if not all, of the other "racially insensitive remarks" or conduct, occurred.  Defendant asserted, without being controverted by plaintiff, that the individuals involved in the alleged prior incidents of harassment or discrimination, were not employed by OCCC after September, 2006.  See defendant's fact # 19.  See Fullwiley v. Union Pacific Corp., 273 Fed.Appx. 710, 713 (10th Cir. 2008) (unpublished) ("[Plaintiff] is unable to provide even an approximate date for a few of the alleged incidents of harassment. As a result, we do not consider these allegations either.").*

[35]*In his brief plaintiff focuses on OCCC's response to the harassment, rather than its severity or pervasiveness.  Plaintiff's response, pp. 16-19.  Plaintiff evidently believes OCCC should have disciplined Brooks because he admitted using a racial slur.  The problem is plaintiff ignores the undisputed fact that Brooks denied using the pejorative term in reference to plaintiff.  Because the only other witness to the incident was unable or unwilling to recall what was said, OCCC was faced*

subjected to racism on a daily basis" his evidence, which included "highly offensive graffiti and a noose hanging" in a work shack, was sufficient to support his hostile environment claim).

. .[36]

OCCC is entitled to summary judgment on plaintiff's hostile work environment claim, and also his constructive discharge claim. In the absence of evidence of a hostile work environment, plaintiff's claim that he was constructively discharged necessarily fails. *See* Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more" than what is necessary to show an actionable atmosphere of racial harassment.).  A reasonable jury could not find, on the basis of the record before the court, that OCCC deliberately made or allowed plaintiff's working conditions to become so intolerable that he had no other choice but to quit.

Retaliation (Title VII)

Plaintiff contends defendant retaliated against him for filing an EEOC charge and submitting an internal complaint of discrimination, by delaying the submission of his disability application to Aetna and revising or failing to correct his return to work date.  The

_____

with a "he said. he said" dispute. Defendant's decision to counsel both plaintiff and Brooks and discipline neither was not unreasonable under the circumstances.

[36]*Therefore, the court does not have to determine whether there is evidence that OCCC's "response to the incidents of which it was apprised was inadequate."* Tademy, *614 F.3d at 1139. The court notes, though, that as plaintiff did not report other incidents of racial harassment after August 4, 2009, defendant's response to his complaint regarding Brooks was sufficient.  See* Duncan, *397 F.3d at 1310 ("If the employer's response ends the harassment by the employee in question, we presume that the remedial action was sufficient.").*

claim is analyzed under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>Antonio v.</u>

<u>Sygma Network, Inc.</u>, 458 F.3d 1177(10th Cir. 2006).  Plaintiff initially must show that "(1)

[he] engaged in protected opposition to discrimination; (2) [he] suffered an adverse action

that a reasonable employee would have found material;  and (3) there is a causal nexus

between [his] opposition and the employer's adverse action."  *Id.* at 1181.  If plaintiff can

establish a prima facie case, defendant then must articulate a legitimate, nondiscriminatory

or non-retaliatory reason to support its employment decision.  *Id.*

Defendant argues plaintiff did not sustain a materially adverse action because his LTD

claim "was simply lost in the mail at no fault of any OCCC employee," defendant's motion,

p. 24, and he cannot demonstrate that the delay was retaliatory because the evidence

establishes it was due to "a mere temporary oversight."  *Id.* at  p. 22.   Plaintiff responds that

it "should be clear that adverse action was taken against him in the processing of his long-

term disability request."  Plaintiff's response, p. 23.

The court will assume that the loss of three months of disability pay does constitutes

a material loss of benefits.  *See* <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548

U.S. 53, 68 (2006) ("[A] plaintiff must show that a reasonable employee would have found

the challenged action materially adverse, which in this context means it well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination.")

(internal  quotations omitted).  Plaintiff does not, though, make it over the causation hurdle

of a prima facie case.

A fact dispute does exist as to what happened to plaintiff's paperwork.[37] Defendant claims its transmission was delayed, while plaintiff has introduced evidence showing that it was lost and replaced with documents that included an incorrect return to work date. Plaintiff testified that he learned that Simpson was responsible for the incorrect date and that, after he learned of the error and returned corrected paperwork to her, she failed to resubmit the documents to Aetna, resulting in his being "shorted three (3) months of disability benefits." Plaintiff's response, p. 27. However, as defendant points out, plaintiff has not shown that his paperwork was mishandled because he engaged in protected activity.

Plaintiff asserts that "OCCC clearly had knowledge that Hill had filed a Charge of Discrimination." Plaintiff's response, pp. 13, 27. He offers no evidence of that fact, though the court assumes the college was aware of the charges as Title VII requires the complainant to "serve notice upon the person against whom the charge is made." Morgan, 536 U.S. at 110. Regardless, plaintiff provides no evidence that Simpson, the employee whom he claims was responsible for the delay in the submission of his LTD benefits application and who failed to correct his date of return to work once it was brought to her attention, knew at the time she was submitting plaintiff's papers, that he had filed charges with the EEOC. *See* Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1176 (10th Cir. 2007) (To satisfy the causation element of a prima facie case, a "plaintiff must show that the individual who took adverse action against [him] knew of the employee's protected activity.") (internal quotations

---

[37]*The court has accepted plaintiff's version of the facts as true for purposes of the summary judgment motion.*

omitted).

Plaintiff did not refute defendant's Fact # 32 that "Simpson was not aware that Hill had previously filed a Charge of Discrimination with the EEOC in September 2009, until she was informed of Hill's EEOC Charge of Discrimination after April 20, 2010. She was not aware of either Charge of Discrimination at the time she directed Lopez to mail and later fax the LTD form to AETNA." Defendant's motion, p. 11. He did not counter Simpson's testimony that the claim forms were faxed on March 22, 2010, and provided no information as to when he returned the document with the revised return to work date to her.[38]

Plaintiff essentially ignores the causation prong of the prima facie case in his brief. The court recognizes that "[a]n employee 'may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Antonio, 458 F.3d at 1181 (quoting Annett v. Univ. of Kan., 371 F.3d 1233, 1239-40 (10th Cir.2004)). However, while temporal proximity alone may give rise to an inference of retaliation, the adverse action must be "*very closely* connected in time to the protected activity." Piercy v. Maketa, 480 F.3d 1192, 1198 (10th Cir. 2007) (internal quotations omitted). The Tenth Circuit has concluded that "an adverse employment action that happened more than three months after the protected activity was not entitled to a presumption of causation." *Id.*, citing Hysten v. Burlington Northern

---

[38]*Although Simpson was aware that plaintiff had "previously made an internal complaint of discrimination," defendant's fact #32, there is no evidence in the record regarding that complaint, when it was made, what it concerned, etc. Plaintiff did not mention it in his brief or rely on it as evidence of causation.*

& Santa Fe Ry., 296 F.3d 1177, 1183-84 (10th Cir.2002); Richmond v. ONEOK, Inc., 120

F.3d 205, 209 (10th Cir.1997).  Without more specific information from plaintiff, the court

cannot determine if a temporal relationship exists between the time Simpson learned of

plaintiff's discrimination charges, either internal or external, and the time she processed his

LTD disability claim form.  As plaintiff has failed to provide evidence of a causal connection

between his discrimination complaints and the mishandling of his application for LTD

benefits, his retaliation claim fails.

Constructive discharge (state law)

Plaintiff's remaining claim is for constructive discharge under state law.  The

standard for adjudicating a constructive discharge claim under Oklahoma law parallels that

used under Title VII.  See Okla. Uniform Jury Instructions, Civ.2d, § 21.8 (2009) ("An

employer is considered to have discharged an employee if the employer intentionally made

or allowed the employee's working conditions to become so intolerable that a reasonable

person in the employee's situation would feel that [he/she] had no choice but to quit.").

Because plaintiff failed to provide evidence sufficient to prove he was constructively

discharged under Title VII, his state law claim fails as well.

As plaintiff has failed to demonstrate a triable question of fact exists with respect to

any of his claims, OCCC is entitled to summary judgment on plaintiff's racial

harassment/constructive discharge claims under Title VII and state law and his Title VII

retaliation claim.  Accordingly, defendant's motion for summary judgment [Doc. # 49] is

**GRANTED**.

**IT IS SO ORDERED**.

Dated this 13th day of April, 2012.

JOE HEATON
UNITED STATES DISTRICT JUDGE